# In the United States Court of Federal Claims

No. 10-11C
(Filed: August 26, 2011)

* * * * * * * * * * * * * * * * * * * * * * * *

KATHERINE BROOKS,

         *Plaintiff,*

v.

THE UNITED STATES,

         *Defendant.*

Equal Pay Act; Prima
Facie Case; Affirmative
Defense;
Merit-Based System

* * * * * * * * * * * * * * * * * * * * * * * *

    *David L. Scher*, Washington, D.C., for plaintiff, with whom was *Robert S. Oswald,* Washington, DC.

    *Armando A. Rodriguez-Feo*, Civil Division, Department of Justice, Washington, DC, for defendant, with whom was *Alexander V. Sverdlov*, Civil Division, Department of Justice, Washington, DC.

_____

OPINION

_____

BRUGGINK, Judge

    Plaintiff Katherine Brooks filed this Equal Pay Act action against the Department of the Navy on January 6, 2010. Ms. Brooks contends that she was paid less than a male for equal work in violation of 29 U.S.C. § 206(d) (2006). Trial was held May 4-5, 2011. For reasons explained below, we conclude that there was no violation of the Equal Pay Act.

FACTS[1]

Six witnesses appeared at trial. The first was plaintiff, Ms. Katherine Brooks.  Second was her selected comparator, Mr. John Propster.  Third was Mr. Roy Hoyt, Ms. Brooks' direct supervisor for several months at the Center for Naval Engineering ("CNE").  Fourth was Mr. Jeffery Hanson, who served in a parallel position to that of plaintiff at CNE during the time period at issue. Fifth, Mr. Christopher Schnedar, who was the executive director of CNE during part of the relevant period, testified.  Sixth, Ms. Pasqualina Holzer, an employee in defendant's human resources department since 1994, testified as an expert on the General Schedule ("GS") pay scale, the National Security Personnel System ("NSPS") pay scale, and the regulations implementing each. A portion of Ms. Sandra Spruill's deposition was also read into evidence.  Ms. Spruill was the Navy-designated specialist on recruitment and placement in the Office of Human Resources during the discovery process.

Ms. Brooks has worked in some fashion for the Navy since 1977. She was apprenticed at the Norfolk Naval Shipyard in Portsmouth, Virginia.  Ms. Brooks received several certificates of achievement and good reviews for her work, including once being named "Woman of the Year" at the Naval Shipyard.  She was promoted to the position of Education Specialist (GS-1710-09) at the Naval Sea Systems Command on September 18, 1983.  She was promptly promoted to the position of Training Specialist (GS-1712-11) on October 30, 1983, which elevated her by two pay grades. In 1986, she was reassigned to the position of Education Specialist for the Atlantic Naval Educational and Training Support center (GS-1710-11).  About a year later, Ms. Brooks was reassigned to the Fleet Training Center ("FTC") at the Norfolk Naval Station as an Education Specialist with the same pay grade (GS-11).  She was promoted to the grade of GS-12 as an Education Specialist on May 22, 1988.  The position was converted to an Instructional Systems Specialist (GS-1750-12) on September 1, 1993.  Her final step increase for the GS-12 pay grade occurred on September 27, 1998.  At that point, Ms. Brooks was no longer eligible for additional step increases within her pay grade.

In June 2002, Ms. Brooks was detailed to the start-up committee when CNE was first created.  A year later, she was officially reassigned from the

---

[1]The parties entered into an extensive stipulation of facts.  Other fact findings are based on the trial presentations.

Fleet Training Center to CNE, maintaining her GS-12 pay grade.   She remained at CNE until her retirement on January 2, 2009.

Two significant personnel changes affected CNE prior to the period of Ms. Brooks' claim.   One, discussed in greater detail below, involved a conversion within all branches of the military from the GS pay system to the NSPS.   This conversion was later reversed, but after the period of time made relevant by this suit.   The second was a multi-phased structural reorganization of CNE.   The relevant period plaintiff has chosen for comparison for her Equal Pay claim begins April 2008, which marks the end of that reorganization.

Prior to reorganization, CNE consisted of seven major divisions, N1, N2, N3, N5, N7, N8, and N9, as shown in Appendix 1 attached to this opinion. Mr. Hoyt and Mr. Hanson testified that CNE's first stage of reorganization was reflected on an organization chart dated January 8, 2008, as found in Appendix 2, in which the seven divisions were combined into four: N1, N5, N7, and N9. Finally, CNE underwent another divisional transition in which N5 was merged into N7, as shown in Appendix 3. This occurred sometime in April 2008, the beginning of the relevant time period for Ms. Brooks' claim.

As is depicted in Appendix 2, the N7 division was the Training Department.   From January 2008 until April 2008, Ms. Brooks was the head of the N72 branch, "Current Execution."   In April 2008, her title changed to Learning Standards/Current Operations Manager, but she retained the N72 branch head position.

For the purposes of this case, Ms. Brooks has chosen Mr. Propster as her comparator.   In April 2008, as can be seen in Appendix 3, Mr. Propster held the position of N73 branch head, Learning Effectiveness/Business Operations Manager, a slot parallel to the N72 position held by Ms. Brooks. Mr. Propster assumed this position by moving from his prior slot as Functional Integration Management Director in N5. A third parallel slot was the N71 branch head position, the Training Requirements/Enterprise Integration Manager, held at the time by Mr. Hanson.   It is undisputed that the three N7 branch head positions involved similar work in similar environments.[2]   It is

_____

[2] Ms. Brooks, Mr. Propster, Mr. Hoyt, Mr. Hanson, and Mr. Schnedar testified that Ms. Brooks and Mr. Propster performed equal work that required equal skill in similar environments.   In its closing argument, defendant

also undisputed that Mr. Propster's salary was $92,252, which was higher than Ms. Brooks' $84,913 salary.[3]

Before he held the position of an N7 branch head, Mr. Propster began working for CNE on December 13, 2004, when he was hired as a program analyst (GS-0343-12). He was promoted to Supervisory Management and Program Analyst (GS-0343-13) on December 24, 2006. This position was considered a "laddered" position, which allows a civilian worker to enter a position at one GS grade and, after meeting the full performance requirements of the position for one year, upgrade to the next GS level. Mr. Propster's laddered position had an entry-level pay grade set at GS-13 and a full performance level set at GS-14. He successfully completed his initial year and was promoted to GS-14 in December 2007. He was shifted from the N5 division to the N73 branch head in April 2008.

Mr. Hanson was hired at CNE on May 14, 2007, as a program analyst. Mr. Hanson testified that, in January 2008, he was assigned to be the temporary director of training in section N7 of CNE, effectively becoming Ms. Brooks' supervisor. He retained his other responsibilities as a supervisor in the N5 branch as well as temporarily filling in this position. In April of 2008, he shifted to the N71 branch head position.

In the midst of the multiple staffing reorganizations at CNE, the Department of Defense converted from the GS pay scale to the NSPS. This occurred at CNE in February of 2008.[4] Ms. Spruill's deposition testimony described three potential pay bands into which employees could be placed upon the shift from GS to NSPS: YA for administrative jobs, YB for technicians, and YC for supervisors. Ms. Holzer testified that, according to

_____

conceded the point.

[3] It is also undisputed that Ms. Brooks' salary was greater than that of Mr. Hanson, who was paid $79,655 as the N71 branch head. These salaries reflect what the individual earned after the conversion to the NSPS pay scale.

[4] The SF-50s, internal human resources documents that reflect any action taken on an employee's file, for Ms. Brooks, Mr. Propster, and Mr. Hoyt all demonstrate the change from the GS system to the NSPS system took place on February 17, 2008. After the period covered by this suit, the military returned to the GS pay system.

Navy regulations, all employees who were in the pay grades of GS-12 through GS-14 at the time of conversion were automatically placed in the YC-02 pay band. There was no flexibility in this conversion, and, due to the span of employees that were classified into this pay band, it was a certainty that there would be employees within the same pay band who would be paid differently than others.

Ms. Brooks converted from GS-1750-12 to YC-1750-02.  Mr. Propster converted from GS-0343-14 to YC-0343-02.  Ms. Holzer and Mr. Hanson testified that the YC-02 pay band consisted of supervisory positions, as opposed to the YA pay band, which was nonsupervisory.[5]

The governing statutes and applicable departmental regulations mandated that Mr. Propster not be reduced in pay or grade as a result of the reorganization.  He held a GS-14 position prior to the NSPS transition and was statutorily entitled to retain his salary for two years after the conversion.[6]  His SF-50 shows that, prior to the transition, he was earning the salary that corresponded with his position in the GS schedule.

Within the NSPS pay bands there were different salary levels.  As Mr. Hoyt and Ms. Holzer testified, unlike the GS pay scale, which has automatic step promotions based upon years served, the NSPS pay structure made no provision for automatic promotions.  Rather, Ms. Holzer explained three ways in which an employee could receive more money in the NSPS pay structure.  First, she described a process that utilized a pay pool.  At the end of each federal fiscal year, a certain amount of money was made available to the management of a given division.  Each different organization would dictate how the pay pool process worked. Employees would be rated and scored by

---

[5] In his testimony, Mr. Hanson testified that he was formally classified in the YA pay band until July 6, 2008, due to a paperwork backlog even though he was performing the duties of a YC supervisor.  Ms. Holzer confirmed that such a backlog could have occurred if an employee's manager failed to timely submit the necessary paperwork for the conversion from a YA position to a YC position.

[6] 5 U.S.C. §§ 5362– 63 (2006).  The Department of Defense's Civilian Personnel Manual, subchapters 1911 and 1920, discuss in detail the transition from the GS to the NSPS pay schedules and where an employee should be placed in NSPS based upon his position in the GS scale.

their supervisors on a scale of 1-5.  Those scoring a 3 or better were eligible for money from the pay pool.  The administrators of the pay pool then determined how best to allocate the money available to the employees who were eligible. Generally, the money could be granted as a one-time bonus or applied as an increase in salary.  If any money was granted to an employee, that determination would become effective the first pay period in January of the following year.  The first pay period in 2009 occurred after Ms. Brooks retired, effectively disqualifying her from being considered for a pay pool salary increase in 2008.

Second, an employee could receive a greater salary through the process of promotion to a higher pay band, i.e., from YC-02 to YC-03.  Such a salary increase required the employee to apply, compete, and be evaluated for another position in a higher pay band.  Only if the employee was selected for the position could she receive a promotion.

The third way Ms. Holzer described for an employee to receive more money in the NSPS system was through reassignment.  A reassignment could be to either a different pay band or to a different position within the same pay band, so long as the duties of the new position were different than the last position the employee occupied.  If such reassignment occurred, the employee could receive up to a five percent increase in pay.

Mr. Hoyt testified that, in addition to the three methods Ms. Holzer described, a supervisor was provided with another option to provide money to employees.  Supervisors were able to recommend on the spot cash bonuses for employees.  This option was only available once per year per employee.  Ms. Brooks received such bonuses on September 25, 2007, and March 17, 2008, totaling $1,250.

Ms. Brooks testified that, in the fall of 2007, prior to the reorganization of CNE, she met with Captain Turner, the Commanding Officer of CNE at the time, because she was concerned about not being paid as much as some of her coworkers.  She also met with Mr. Hoyt, her acting supervisor, in January or February of 2008, when the restructured organization charts were distributed to personnel at CNE.  Mr. Hoyt testified that Ms. Brooks was concerned with a proposed version of the new organizational chart in which she would be moved from the position of branch head to that of subordinate to Mr. Howard Davies.  Mr. Hoyt testified that those in charge of restructuring the divisions knew she was planning to retire and therefore assumed that it would be easier

6

for her not to be placed into a branch head position. After she expressed her concerns, however, she was placed in the N72 branch head position in the organization chart, as reflected in the final reorganization that took place around April 2008.

On June 2, 2008, Ms. Brooks submitted a request to retire, effective January 2009, which was approved. Her last physical day in the office was July 3, 2008, when a retirement ceremony was held for her. She then took extended leave until her actual retirement date of January 2, 2009. During her extended leave, Mr. Howard Davies was reassigned from Program Analyst to the position of Supervisory Management Analyst, filling her position during her leave. He was paid $84,648. Ms. Brooks' final salary was $84,913.

## DISCUSSION

Ms. Brooks makes only one claim: that she was paid less than Mr. Propster for no reason other than gender, in violation of the Equal Pay Act, 29 U.S.C. § 206(d). She requests promotion, economic damages (future and back pay), attorneys' fees, and liquidated damages.

To successfully prove a violation of the Equal Pay Act, plaintiff must demonstrate that CNE paid "different wages to employees of opposite sexes 'for equal work on jobs the performances of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1) (1970)). Plaintiff has the burden to demonstrate that she was paid less than Mr. Propster for a job that required substantially equal skill, responsibility, and effort. *Cooke v. United States*, 85 Fed. Cl. 325, 342 (2008).

Once plaintiff establishes her prima facie case, the burden shifts to defendant to demonstrate one of four statutorily articulated affirmative defenses. Defendant must demonstrate, by a preponderance of the evidence, *id*. at 347, that the difference in pay is due to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earning by quantity or quality of production; or (iv) a differential based on any other factor than sex." 29 U.S.C. § 206(d)(1) (2006). The burden on the employer, here the government, is "a heavy one," and it must prove that the factor causing the difference in wage is actually the gender-neutral factor identified. *Cooke*, 85 Fed. Cl. at 347.

I.      Plaintiff's Prima Facie Case

In order to establish her prima facie case, plaintiff chose Mr. Propster as her comparator to demonstrate that a male was paid more than she was paid for substantially equal work. It is uncontested that, during the relevant period after the April 2008 restructuring, the three N7 branch heads—Ms. Brooks, Mr. Propster, and Mr. Hanson—all performed substantially equal work that required equal skill, responsibility, and effort under similar working conditions. It is also uncontested that Mr. Propster was paid more than Ms. Brooks in April 2008 when they were both branch heads in the N7 division.

Defendant nevertheless contends that Ms. Brooks has not established her prima facie case because she has selected one comparator from among a group of four men in similar positions, three of whom were paid less than she was paid. From November 2007 to January 2009,[7] there were five individuals, four male, one female, holding positions as N7 branch heads. Ms. Brooks was paid more than three of these male branch heads. Defendant argues that, because three men were paid less than Ms. Brooks was for substantially equal work, it is insufficient for plaintiff to select one of several possible comparators to demonstrate her prima facie case. Defendant contends that, as part of her prima facie case, plaintiff must provide additional evidence to demonstrate that discrimination was the reason for the difference in pay.

The Supreme Court laid the groundwork for analysis of claims under the Equal Pay Act in *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974). In that case, Corning Glass Works paid higher wages to its male night shift inspectors than to its female day shift inspectors. State laws prohibited women from working at night, but the pay difference between the men and women extended beyond the shift differential;[8] the men received a base wage that was significantly higher than that which the women received. *Id*. at 190-91. At some point between 1944 and 1964—when the Equal Pay Act became effective—the state laws changed, and women were permitted to work at night. After a series of changes to their wage schemes, Corning Glass Works still had a system that effectively retained the gender-biased pay differential

---

[7] We disregarded the portion of defendant's argument which centered on the period beyond plaintiff's claim.

[8] The shift differential paid night employees more than daytime employees.

for anyone hired prior to 1969. *Id.* at 194. In determining whether there was a violation of the Equal Pay Act, the Court placed the burden of proof on plaintiff to show "that an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Id.* at 195 (internal citation omitted). Plaintiff carried this burden by demonstrating that no matter what time the inspections were occurring, the women were performing the same work as the men for less money. *Id.* at 208. The Supreme Court held that defendant had failed to prove any affirmative defense because the reason for the original pay differential was rooted in the "generally higher wage level of male workers and the need to compensate them for performing what were regarded as demeaning tasks." *Id.* at 205 (internal citation omitted).

The Federal Circuit applied *Corning Glass Works* in *Yant v. United States*, 588 F.3d 1369 (Fed. Cir. 2009). That case involved a class action of two mixed gender groups: physician assistants and nurse practitioners. Each argued that the other group was being paid more for the same work despite one group having different educational requirements. *Id.* at 1371. The Federal Circuit echoed the Supreme Court when describing what was necessary for a plaintiff to prove its prima facie case:

> In order to establish a prima facie case of wage discrimination under the Equal Pay Act, plaintiffs must show that an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

*Id.* at 1372 (internal citations omitted). The court added that plaintiff did not have to make "a showing of discriminatory intent" but had to provide "a showing that discrimination based on sex exists or at one time existed." *Id.* at 1373. Defendant here focuses on the court's statement that "[a]n Equal Pay Act violation is established when an employee demonstrates past or present discrimination based on sex." *Id.* at 1374. Unlike *Corning Glass Works*, the court determined that there was no genuine issue of fact that the pay scales for nurse practitioners and physician assistants were historically based on factors other than sex, such as one group's salary being determined by a regional versus national pay scale. *Id.* at 1373. In the absence of a history of gender

9

discrimination, as in *Corning Glass Works*, the Federal Circuit ruled there was no violation of the Equal Pay Act. *Id.* at 1374.

Defendant believes that this precedent supports its view that merely pointing to a single comparator is insufficient to satisfy plaintiff's prima facie case, particularly when, as here, there are other male employees who earn less than she. We disagree. In *Yant*, the Federal Circuit was confronted with very different facts from those in this case. Consequently, it had no occasion to speak directly to the legal issue defendant raises.[9] In effect, defendant is conflating plaintiff's statutory burden of proof with the need to respond to a defense. We adopt the view expressed in *Moorehead v. United States*: "To show a prima facie case, 'the plaintiff need not compare herself to all similarly classified male employees, but may choose one or more among those allegedly doing substantially equal work.'" 88 Fed. Cl. 614, 619 (2009) (quoting *Ellison v. United States*, 25 Cl. Ct. 481, 486 (1992)). The evidence has plainly demonstrated that plaintiff was paid less than Mr. Propster for equal work. Plaintiff has therefore met her initial burden, and the burden of proof shifts to defendant to demonstrate an affirmative defense.

II.     Defendant's Affirmative Defense

Defendant has asserted two statutory defenses: that the difference in pay was (1) based upon a merit-based system, or (2) based on any factor other than sex. As to the first defense, the government relies upon Department of Defense statutes and regulations which articulate the specific steps that must be taken to achieve the conversion from the GS to NSPS system. Specifically, defendant contends that Mr. Propster was statutorily entitled to retain his higher GS-14 salary at the time of conversion to the NSPS. As explained below, we agree with defendant that the conversion process from the GS to the NSPS system reflected a change from one merit-based system to another, and that the resulting difference in pay therefore was not a violation of the Act. We therefore need not address the alternative defense.

---

[9] We note that even if the Federal Circuit meant to impose a new requirement of evidential proof of gender discrimination on an Equal Pay Act claim, the result here would remain the same. As discussed below, defendant has proven its affirmative defense.

To establish the merit-based system defense, defendant must demonstrate "that a merit system was an organized and structured procedure by which employees were evaluated systematically and in accordance with predetermined criteria." *Raymond v. United States*, 31 Fed. Cl. 513, 518 (1994). "A merit system which measures quantity or quality of performance and compensates employees accordingly is a valid defense for a pay differential under the Equal Pay Act." *Cooke*, 85 Fed. Cl. at 347. To be sufficient as a merit-based system defense, the employees must be aware of the system, and it must not be based upon sex. *See EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 725-26 (4th Cir. 1980). Further, a merit-based system does not have to be void of subjectivity. *Id.* at 726 ("An element of subjectivity is essentially inevitable in employment decisions; provided that there are demonstrable reasons for the decision, unrelated to sex, subjectivity is permissible.").

CNE transitioned from the GS to the NSPS schedule in February 2008, after the first structural reorganization at CNE took place in January 2008.[10] At trial, Ms. Holzer, Mr. Hoyt, Mr. Propster, and Mr. Hanson all testified that departmental regulations and statutes dictated how to transition from the GS to the NSPS pay scale. Subchapters 1911 and 1920 of the Department of Defense's Civilian Personnel Manual, through tables and prose, instruct where an employee should be placed in NSPS based upon his position in the GS pay schedule. Upon the transition, the Navy was statutorily obligated to maintain employees' salaries at the same level they were prior to the conversion. Any employee who served 52 weeks or more in a position and was subsequently moved was "entitled . . . to have the grade of the position held immediately before such placement be considered to be the retained grade of the employee in any position he holds for the 2-year period beginning on the date of such placement." 5 U.S.C. § 5362(a) (2006); *see also* 5 U.S.C. §5363 (2006). In other words, upon the conversion, whatever salary an employee earned under the GS schedule had to be retained in the transition into the NSPS schedule.

This means that, after his position was converted to the NSPS pay scale, Mr. Propster could not receive a lower salary than the one he earned as a GS-14. His salary had to be maintained for a two-year period, which embraced the April 2008 restructuring that occurred two months later at CNE. Even though

---

[10] The organizational chart from this time period is displayed in Appendix 2.

Mr. Propster was, in essence, demoted in that restructuring,[11] he was statutorily entitled to retain the salary he received as a GS-14 prior to the transition. Defendant therefore has satisfied its burden of demonstrating that the pay differential was based on the operation of a merit-based system that consisted of an "organized and structured procedure" applying objective "predetermined criteria." *Raymond*, 31 Fed. Cl. at 518.

The NSPS transition occurred prior to the final CNE restructuring which placed Mr. Propster and Ms. Brooks in equal positions. Plaintiff contends that, despite Mr. Propster's right to the higher retained GS-14 salary, the Navy was under an obligation to do anything within its power to equalize the pay of the two employees. Recognizing that she was receiving the salary appropriate to her position, Ms. Brooks contends that the Navy should have used other tools to bring her compensation closer to that of Mr. Propster. In support of that contention, Ms. Brooks argues that, although she retained the same title upon reorganization, she was assigned more work than she had been responsible for prior to the reorganization. She argues that the CNE had an obligation to reassign her to a different position,[12] give her a five percent raise, and award her an on the spot bonus, all in order to equalize her pay.[13]

Plaintiff relies upon *Cooke* for the proposition that the government was under an obligation to execute whatever options were available to it, including creating a new position for Ms. Brooks. In *Cooke*, the court held that the National Transportation Safety Board ("NTSB") did not fulfill its merit system defense because defendant failed to give Cooke, a female, "the same opportunity to compete for an SES level position as her male comparators." 85

---

[11] N5, where he was the director, was merged into N7, and he became one of three N7 branch heads instead of a division director.

[12] Plaintiff bases this argument on the organization chart in Appendix 3, which shows 14 people directly under Ms. Brooks. Many of these were military personnel, who were subject to a different chain of command and did not require as much immediate supervision as a civilian employee.

[13] Plaintiff conceded that implementing all these measures would not result in identical pay due to the statutory limitations on the salaries for specific positions and bonuses. Nevertheless, she argues that this is the only way defendant could have come close to equalizing Mr. Propster's and Ms. Brooks' salary within the strictures of the NSPS.

Fed. Cl. at 348.  Cooke was a GS-14 and was hoping for a promotion to the SES level.  When positions opened with a higher pay scale, Ms. Cooke was not afforded an opportunity to compete for those positions.  Instead, in all but one circumstance, the position was merely assigned to another department head.

In contrast, in Ms. Brooks' case, there were no unique opportunities afforded to any of the N7 branch heads for salary enhancement.  Neither Mr. Hanson nor Mr. Propster were offered an advancement to the YC-03 pay band.  Ms. Brooks was not deprived of advancement opportunities, and her comparator was not offered an advancement opportunity for which she was overlooked.

Plaintiff in *Cooke* also asserted that she should have been awarded overtime pay because such an award would have brought her salary closer to that of her comparators.  Defendant there relied upon an unwritten policy that supervisors, such as Ms. Cooke, did not receive overtime pay.  The court was dissatisfied with this argument: "Furthermore, for an unwritten policy to qualify as a merit system defense, the employer must show that the policy is made clear to all employees."  *Id.* at 348-49.

Defendant makes no analogous argument here.  The standards and guidelines for advancement in the NSPS system are laid out in regulations and statutes, and these regulations are publicly available.  Plaintiff's treatment was consistent with all regulations and statutes governing the salaries at CNE.

A third distinguishing factor is that, in *Cooke*, plaintiff had received substantially smaller bonuses than her comparators for apparently equal work evaluations.  "[T]he gross disparity between the performance awards granted Ms. Murtagh Cooke and her comparators in 2003 for the same quality of work begs the question whether the NTSB applied the subjectivity using clear predetermined criteria."  *Id.* at 349.  By contrast, here, there were no bonuses or increases for the other branch heads.  In fact, Ms. Brooks received two on the spot cash bonuses, one on September 25, 2007, and one on March 17, 2008, which, according to Mr. Hoyt, were allowed only once per year.  Ms. Brooks could not have received another until 2009, by which point she had retired.

Finally, the *Cooke* court noted that, in order to have a valid merit system defense, the system must be "an organized structured procedure by which [the

13

employer] evaluated employees systematically and in accordance with predetermined criteria." *Id.* at 349.  The *Cooke* court did not find evidence of such a system, or if there was such a system, the employees were unaware of how it functioned or how they could receive a greater salary.  "While a merit system need not be completely devoid of subjectivity, the NTSB's actions suggest *nothing but* subjectivity." *Id.*

The evidence here is to the contrary.  Defendant has demonstrated that the statutes and regulations were followed for each of the employees discussed at trial, regardless of gender or position. There is no evidence that defendant applied the regulations in a subjective way.  The transition from the GS to the NSPS was rigid in its application. In the NSPS structure, an employee could receive a higher salary through a promotion, a reassignment, or through the annual pay pool.  Ms. Brooks retired before her first opportunity to be eligible for the pay pool, as Ms. Holzer testified that the pay pool went into effect in the first pay period in January 2009.  It is evident that the system, while perhaps not wholly void of subjectivity, was gender-neutral and applied as objectively as possible.

The conversion process, in short, reflected the transition from one merit-based system to another, and nothing in the conversion itself deviated from those principles.  It was not defendant's duty to create a new position for Ms. Brooks or to place her in a different pay band during the transition.  Defendant followed the published regulations.  There was an organized, transparent system that accounts for the difference in pay.  Defendant has demonstrated that Mr. Propster's higher pay was the result of the application of a merit-based system and that it did not constitute a violation of the Equal Pay Act.

Defendant is entitled to judgment dismissing the complaint.  It is so ordered.  The Clerk of Court is directed to enter judgment accordingly.  No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge

14